palestine1.txt

1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK : CIVIL TERM : PART 60

---

X

PALESTINE MONETARY AUTHORITY )

Plaintiff )

- against - ) Index Number 107777/05

DAVID STRACHMAN, as Administrator of the ESTATES of YARON UNGAR and ERFAT UNGAR, and THE BANK OF NEW YORK COMPANY, INC. )

Defendants )

---

X

New York Supreme Court
60 Centre Street
New York, New York

June 6, 2005

B E F O R E :

HONORABLE BERNARD J. FRIED, Justice

A P P E A R A N C E S :

Attorneys for Plaintiff:

BUSHELL & VALLIERE LLP
60 East 42nd Street
New York, New York 10165
By: VICTOR C. BUSHELL, ESQ.
CEM OZER, ESQ.

RALBIAN HAGESTY, LLP
888 17th Street, Suite 1000
Washington, DC 20006
BY: CLAIRE A. DELELLE, ESQ.

dw

2

Attorneys for Defendant Ungar:

JAROSLAWICZ & JAROS
150 William Street
New York, New York
By: ROBERT TOLCHIN, ESQ.

Attorneys for Defendant Bank of New York:

EMMET MARVIN & MARTIN LLP
120 Broadway
New York, New York 10271
By: ALFRED W. J. MARKS, ESQ.
ALEXANDER SHAPIRO

DENISE WILLIAMS, RPR
Official Court Reporter

dw

3

-Proceedings-

THE COURT: Are you accepting service of this Order to Show Cause and request for TRO?

MR. MARKS: Yes, Your Honor.

MR. TOLCHIN: Yes. I should say that the summons and complaint has not been served. So the Court actually has no personal jurisdiction over the case itself but I suppose this is a good time to raise that formally.

THE COURT: For the purpose of what I'm doing here this morning the papers that I have in my hand is an Order to Show Cause, a Memorandum of Law in support of that application, the RJI, an affidavit which was filed on April 21st in the State of Rhode Island, Temporary Restraining Order and Summons and those are the papers that, Mr. Marks, you are accepting those papers?

MR. MARKS: Sorry, can you say again which papers.

THE COURT: Let me give you the file.

MR. MARKS: Your Honor, we received this morning the summons and complaint on the action index number 107777/05, and temporary restraining order, Order to Show Cause, the accompanying Memorandum of Law, that we accept service of this morning, Your Honor. And the RJI was handed to me this morning in court. With respect to this other document in this file which was dated April 21, 2005, this is the first time -- I don't believe we have

dw



seen this document, Your Honor.

MR. TOLCHIN: Your Honor, in answer to the question, to clarify what I said, my understanding of this Court's jurisdiction the way it works under the CPLR --

THE COURT: I wasn't discussing jurisdiction, I simply wanted to know what papers you had received and --

MR. TOLCHIN: I have received only the Order to Show Cause, nothing else.

THE COURT: That's the answer to the question. And with regard to what is described as the District Court final judgment and a copy of some papers that were filed under index number 105521 of '05 that's not the index number here. Why is there a different index number?

MR. TOLCHIN: That's papers that I filed, that judgment is something that I actually filed. That was that was a Rhode Island Federal Court judgment that was affirmed on appeal by the First Circuit and then as part of collection efforts we domesticated the judgment into New York by filing it with the county clerk in New York and that index number is the index number that was assigned when the judgment was filed here.

THE COURT: Who is that assigned to?

MR. TOLCHIN: Its just a judgment, and you are 100 percent right they could have made their application under that caption.

dw



MR. BUSHELL: I can speak briefly to that last part.

THE COURT: I just want to know why I have two sets of papers and who has what. So go ahead.

MR. BUSHELL: The last point, I was brought in as counsel on Friday this past week, Thursday evening,

Friday. I believe previous counsel had tried to file something under that original index number but were told they could not, that a separate action had to be commenced, so that's what we did.

THE COURT: So everybody knows what I have and you have what I have, is that correct at this point?

MR. MARKS: Yes.

THE COURT: Its your application.

MR. BUSHELL: Good morning, Your Honor.

My name is Victor Bushell. I'm here on behalf of the PMA seeking relief. The underlying judgment at issue was obtained in Rhode Island Federal Court and I think it was, I don't mean to understate it, somewhere in that hearing $116 million and the judgment was obtained against the PLO, the PA and several unrelated entities to the PMAs.

So there's a judgment against the PLO and the PA for $116 million and Plaintiff's Counsel in that action fairly --

dw

6

-Proceedings-

THE COURT: Isn't the lead defendant in that judgment not the PLO but the Palestinian Authority?

MR. BUSHELL: The PLO and PA, correct.

THE COURT: I see that. And what is the relationship between the Palestine Monetary Authority and any if any relationship between the Defendants in the Rhode Island action?

MR. BUSHELL: To speak to that perfectly, Your

Honor, if its okay with you I brought --

THE COURT: I'm going to hear from you first.

MR. BUSHELL: The PMA is an independent regulatory body that is the equivalent of the Federal Reserve Bank of the United States.

THE COURT: But is it an agency of the Palestinian Authority?

MR. BUSHELL: I don't believe so but I'm not entirely sure. Sorry, did you say of the Palestinian Authority?

THE COURT: Or the Palestinian Interim Self-government Authority or any of the listed Defendants.

MR. BUSHELL: The PA, as I understand, is a current governing body.

THE COURT: Is there a person trying to hear -- your client, sir?

MR. BUSHELL: Yes.

dw



THE COURT: Why don't you let him sit at the table with you.

For our record give me his name.

MR. BUSHELL: George Abed, A-b-e-d. He is the Governor analog to Alan Greenspan of Palestine Monetary Authority.

THE COURT: Go ahead, sir.

MR. BUSHELL: So it is a regulatory body. The purpose of the PMA, as I understand it, it was supposed to be set up in the event there was ever a state created if

and when there was ever a state created for the people of Palestine. Its obviously not happened yet. I'm not here to talk about that. So it was never fully engaged but what it has done is serve as a pure commercial clearing house for transactions to ease commerce in the State of Palestine. It was set up as part of the Oslo Accord, court in 1995 created by Israel or in part by Israel. The U.S. funded it. Its a legitimate organization. It clears money for the Palestinian economy. It holds, I believe, in trade Israel shekels, U.S. dollars and the like. So that's what it is.

THE COURT: I interrupted your presentation with that question. Why don't you continue.

MR. BUSHELL: Sure.

So what Plaintiffs in the underlying action

dw



Rhode Island Federal Court did, and again no qualms with this, they obtained a restraining order and subsequently an injunction enjoining fairly so the transfer of any assets that are -- I will read the -- its actually in Paragraph B "any assets of the PLO" --

THE COURT: What paragraph?

MR. BUSHELL: Exhibit B, sorry, to the affidavit of George Abed and attached there is the restraining order and the injunction.

THE COURT: Yes, sir.

MR. BUSHELL: And it restrained the assets the transfer of the assets of the PLO or PA and that's fairly

so because going back to where I started, Your Honor, that was what the judgment that was who the judgment was secured against. Where the system, if you will, went wrong is Plaintiffs in that action served a notice of that injunction on the Bank of New York asking them to enjoin all assets of the PA and PLO which are held and or titled in --

THE COURT: What are you reading from?

MR. BUSHELL: From something called the Notice of Injunction. This was my error and I apologize for that.

THE COURT: What exhibit is it?

MR. BUSHELL: I'm going to hand it up now. Its

dw





something that Mr. Tolchin's client served on the Bank of New York. They have a copy of it but I just attached it just now, and if you will see what they have done in the "Take Notice" section PA and PLO are held and or titled in and the last one last entity is the Palestinian Authority. There are no assets of the PLO or PLA -- or PA held or titled in the Palestine Monetary Authority, so it was a bit of a leak. What the Bank of New York ended up doing, nearest we can tell, is they seized $30 million of funds that were being cleared by the PMA. They weren't given the PMA funds, they are commercial bank funds, and there is a list of those banks if you will, sir, attached to Exhibit D.

THE COURT: D as in David.

MR. BUSHELL: D as in David shows --

THE COURT: That's the spreadsheet.

MR. BUSHELL: Yes, it shows the reserves held by PMA by all the banks and that's the sum total of them. Exhibit E represents the bank's to the same affidavit --

THE COURT: Is what?

MR. BUSHELL: Exhibit E is the banks who we believe assets were enjoined when they froze the account of the PMA, the transactions that the PMA processed.

So if I can shorthand that and I am going to answer any questions because I know that was a lot of

dw



information fast, they got the wrong party and the wrong accounts and so the PMA problem is they are effectively shut out of the ability to clear through the U.S. in dollar balances which affects the PMA but it also affects legitimate businesses that transact with the Palestine economy who have nothing to do with this at all. So they kind of got the wrong guy and the wrong guy's account and we are not looking to make this into the Wild West, that's just simply factually what happened and what we want is that $30 million released and the ability to go about our business or the ability of the PMA to go about its business of continuing to act as an essential bank for Palestine for commercial banks in Palestine. Its no more alarmist than that.

What I do understand the case what I have been informed is the case obviously this is an area that is,

sadly, having a tough time, the Middle East and the last thing that area needs, quite frankly, is a conflict in a legitimate banking institution in a difficult area and this again is to repeat the bank itself the PMA and its bank affiliate I guess the PMA was created as part of a Oslo Accord which was an agreement with Israel.

THE COURT: Why don't I hear from the other side and you can respond.

MR. BUSHELL: Thank you, Your Honor.

dw



THE COURT: You're welcome.

I think I should hear from the bank first, unless you think it makes more sense to hear from you, Mr. Tolchin.

MR. TOLCHIN: Your Honor, you're the judge.

THE COURT: Present it in a way that's going to be clearest to me.

MR. MARKS: I will speak first, Your Honor.

Good morning.

I think Mr. Bushell pointed out what has gone on here, Your Honor. The Bank of New York is in receipt of a the Notice of Injunction that was issued by the Federal District Court in Rhode Island as well as an information subpoena with restraining notice that was issued pursuant to New York Enforcement of Judgment Procedures. As Mr. Bushell points out, the notice as well as the restraining notice served under New York CPLR points out that the injunction applies to all assets of the

Palestinian Authority and the Palestine Liberation Organization, however title then proceeds to go on and lists several entities directly telling the bank that assets of the Palestinian Authority and Palestine Liberation Organization --

THE COURT: You have to read a little slower and a little clearer.

dw

12

-Proceedings-

MR. MARKS: Are held and or titled in the names and it lists several names --

THE COURT: Let me ask you a question, once you got this restraining order you simply abided by it as an effect of stay, is that correct?

MR. MARKS: Yes.

THE COURT: You really have no interest in this?

MR. MARKS: We don't.

THE COURT: You abided by a restraint issued by Rule 65D and you are complying with it?

MR. MARKS: Yes, Your Honor, as well as the bank also received a restraining notice that was served upon the bank and actually with the enforcement mechanisms of the CPLR which I don't see as an exhibit to the papers that you have before you.

THE COURT: I don't see that.

Let me before -- I don't think I have any more questions but before I turn to Mr. Tolchin, Mr. Bushell, I have a fundamental question for you. The restraint that is at issue here is a notice under Federal Rule of Civil

Procedure 65D and it seeks to enforce a District of Rhode Island judgment. Why don't you go back or why didn't you go back to Rhode Island to have this restraining order which was subject which was issued in accordance under a or presumably under a federal mandate clarified or

dw

13

-Proceedings-

modified?

MR. BUSHELL: Its a fair question. The first point is that the execution occurred in New York --

THE COURT: But if the restraint that was issued was improperly issued under a federal mandate the district judge in Rhode Island would correct it.

MR. BUSHELL: The restraining order itself and where the confusion occurs --

THE COURT: Let me ask you, does the district judge in Rhode Island have any authority to direct the modification or amendment or whatever the correct word would be of a notice of restraining order that was issued pursuant to the federal rules in accordance with the judgment of the District Court?

MR. BUSHELL: The notice or the restraining order itself, in other words --

THE COURT: Let's deal with the notice first which is pursuant to Rule 65D.

MR. BUSHELL: I'm not 100 percent sure of the answer to that question, Your Honor. The assets are in New York. The judgment judge, I forgot his name, the federal judge's judgment was domesticated in New York and

so the judgment is being executed in New York. The Plaintiffs in the underlying action brought their own proceeding if you remember how we sort of started this

dw



dialogue this morning.

THE COURT: I remember it.

MR. BUSHELL: Brought their own proceeding in New York so it seems to make sense for us to be here in New York. The other issue along with that --

THE COURT: That proceeding if it was instituted by this document that was filed in New York and docketed does not list in it, unless I'm misreading it, the Palestine Monetary Authority as one of the judgment debtors it only lists in that index which is one if I'm reading the number right one 105521 of '05. I don't see that it lists the Palestine Monetary Authority.

MR. BUSHELL: I think that's right, Your Honor, and I think that's what the problem was initially when then counsel tried to go in and engage this process through that domesticated judgment and that's kind of the point why we are here today, Your Honor. They are not a party so we are not allowed PMA was not allowed to engage through that index number but being practical banks in New York, they filed an action in New York, domesticated it in New York, the funds are being held in New York, we have a wonderful commercial part in New York --

THE COURT: I'm glad to hear that our parts are considered that way. I appreciate that. We think they

are wonderful, but to turn to the notice, the notice is



pursuant to a Federal Rule of 65D which is follows from the judgment of the District Court. Wouldn't the simplest thing be to go into the District Court and say to the judge up there this is a restraining order that's improperly issued or notice of restraining order that's improperly issued?

MR. BUSHELL: The clearest, simplest and most straightforward option answer is we were presented with doing it in New York. I am local counsel. New York seems to have jurisdiction. Does that mean there might not be a second option, that's possible. That is not my domain. It doesn't change our position.

THE COURT: I gather.

Mr. Tolchin.

MR. TOLCHIN: Thank you, Your Honor.

I have a bunch of different topics to cover, Your Honor, the first one is very procedural and since Mr. Bushell was exalting the virtues of the commercial division --

THE COURT: You can do the same.

MR. TOLCHIN: I will, I will do it with citation to some authority.

This is at the heart a proceeding to enforce a judgment. Its a little inverted because the person who its being enforced against has brought it rather than the

creditor, but at its heart we are here because we have a judgment and we are trying to collect it and the commercial division rules, Rule C says the following "will presumptively be transferred out of the division even if the monetary threshold is met" and item four is "proceedings to enforce a judgment regardless of the nature" --

THE COURT: That is exactly correct.

MR. TOLCHIN: This really is not a commercial division case. I recognize that's discretionary with Your Honor whether you wish to keep it or not.

Turning to the merits. Your Honor is 100 percent correct that, yes, this is a case about an injunction issued in Rhode Island by a Rhode Island federal judge and notice of injunction that was served informing the Bank of New York about that injunction and we are not here about any New York process. Yes, we did take the federal judgment and domesticated it in New York by filing it with the county clerk and we did that so that we could then serve information subpoenas on various financial institutions in New York because for the federal judgment out of Rhode Island you can't serve New York information subpoenas without domesticating it here. So we did that. We are not here challenging -- in this Order to Show Cause we are not here challenging that any New

York process or the domestic case of the New York judgment. What they don't like is that the federal judge in Rhode Island has enjoined the Bank of New York from transferring any money belonging to the named Defendants or to use the language of the order --

THE COURT: Where is the order?

MR. TOLCHIN: If you look in their Order to Show Cause its Exhibit B.

THE COURT: C?

MR. TOLCHIN: Exhibit B and there's two different documents that is --

THE COURT: My Exhibit C is a letter.

MR. BUSHELL: Its B.

MR. TOLCHIN: B, Your Honor. Your Honor, if you look at the third page of what's annexed as Exhibit B towards the bottom of the page under the wherefor line, do you see that?

THE COURT: I see it.

MR. TOLCHIN: In that paragraph it refers to the Palestinian Authority or the Palestine Liberation Organization those are the named Defendants and it continues referring to their officers, agents, servants, employees, fiduciaries and natural legal persons, etcetera, etcetera. It is obviously the Plaintiff's contention that the Palestine Monetary Fund is precisely

dw



that, is within the scope of this injunction because it is

nothing but an arm or a branch of the Palestinian Authority or the PLO whichever one or both of the Defendants. We only got these papers over the weekend and we only got them in part but as I have been sitting here I have been reading through them carefully as Mr. Bushell has been talking and I can show Your Honor that even without discovery on the issue, and I'm not saying I don't need it, I'm not saying I will try the case this moment or that I would prefer to, but even on the strength of the papers they attach they have some problems. They do not at all establish that they are prima facie irrefutably independent so that Your Honor should release the money.

Let me take you through it. If Your Honor will look at Exhibit A to their Order to Show Cause and I'm going to give you a number of references in this document and its a long document and there are a number of references, but I would like to go through them. If we take a look at Article 5 of that document I'm just going to go through it from top to bottom in no particular order. Its on the third page. That article begins by saying that "the Monetary Authority aims at securing soundest of banking work maintaining monetary state and encouragement of economic growth --

THE COURT: A little slower.

dw

19

-Proceedings-

MR. TOLCHIN: --"in Palestine in line with the general policy of the National Authority." So the policy of the National Authority is what runs them.

Go down to Item 6. "Their objective is to keep and manage the National Authority reserve of gold and current policies." National Authority is a defining term in this document. If you go back to the first page National Authority is defined to mean the Palestine National Authority. That's the named Defendant, PA.

Now Item 7 of their objectives, "surrender financial and economic advice to the National Authority."

Eight, "serve as financial agent to the National Authority."

Turn two pages to Article 8, Article 8 provides that "the authorized capital of the Monetary Authority shall be $15 million U.S. dollars or the equivalent in the circulated currencies to be paid by the National Authority and the capital may be increased by a decision to be adopted by the Chairman of the National Authority at their recommendation of the board," and at the time this document was entered the Chairman of the National Authority was none other than Yasser Arafat who was the head of the National Authority and the PLO.

Article 9 provides "if the budget for each fiscal year indicates that the assets of the Monetary

dw



Authority are less than its total capital and commitments the deficit shall be shall be covered from the reserve balance assigned to that and in case of insufficiency of that the National Authority shall pay the difference." So the National Authority has to meet their shortfalls. This

is an alter ego case, Your Honor.

Moving on to what I think is really the most important provision here, Article 12. Article 12 is at the bottom of the page and the article itself is at the top of the following page. And its below the staples. It says "after the deduction of all commitments and expenses and completion of all transfers to the general reserve account the net profits shall delve upon the treasury of the National Authority." So if the Palestine Monetary Authority has a shortfall, we just read the National Authority makes it up and if they have excess a surplus they have to give it to the National Authority by this provision. That doesn't sound very independent, Your Honor.

Article 13 says "distribution of the net profits mentioned in the preceding articles may not be obligatory, why, the Monetary Authority ceases from the facts of its budget and after approval of the Chairman of the National Authority that its financial spending will be affected." Therefore, the head of the PA has veto power about whether

dw



they transfer the money back in or out of the PA.

Now if we look in the next chapter, go down to Article 15 there's a series of provisions governing how the members of the board and the Governor and the Deputy Governor, Mr. Abed the Governor how were they appointed. Item A "the Governor and Deputy shall be appointed by a decision to be taken by the Chairman of the National

Authority." Item B, "the representative of the Ministry of Financial shall be appointed by a decision to be taken by the Chairman of the National Authority" and Item C, "the remaining board member shall be appointed by 12 members by a decision to be taken by the Chairman of the National Authority and three members proposed by the cabinet and by a decision to be taken by the Chairman of the National Authority. And one final member proposed by the Governor and by a decision to be taken by the Chairman of the National Authority."

Article 17, Your Honor, provides that "the board of directors is the higher authority for the issue of decisions of the Monetary Authority. It is entrusted with approving policies of the Monetary Authority and supervision of the management of its operations in a manner that serves the established economic policy of the National Authority and the board shall be responsible before the Chairman of the Palestinian National

dw



Authority."

We go on to Item 19, "the salary and other financial rights of the Governor and Deputy Governor as well as the remuneration of board members shall be determined by a decision to be taken by the Chairman of the National Authority."

Article 30, "the Governor, Deputy Governor or member may tender his resignation from his position to the Chairman of the National Authority, in which case another

person shall be appointed in his place within a period not exceeding three months."

Skip down to Article 31, "services of the Governor, his Deputy or any member shall terminate by a decision to be issued by the Chairman of the National Authority and certainly enumerated cases."

Article 32, says "by a decision to be issued by the Chairman of the National Authority at the proposal of the cabinet independent auditors shall be appointed."

Go on to Article 34, we now have a series article 34 and 35 and 36 and 37 they are lengthy, I would rather not read them, I will describe them. They are a series of provisions explaining what the duties of the Palestinian Authority are -- are you standing for a reason?

MR. BUSHELL: We attached this, Your Honor, as

dw



an exhibit. We don't dispute that this is what was written at all.

MR. TOLCHIN: Thank you.

THE COURT: I'm going to give you a chance to respond.

MR. BUSHELL: Just to shut down the reading of the record, but its fine. I just wanted to make a point.

MR. TOLCHIN: Chapter 4 provides Article 34 provides "the Monetary Authority may accept deposits from the National Authority."

Article 35, "the Monetary Authority serves as a

financial agent to the National Authority."

THE COURT: Is your point, Mr. Tolchin, that the articles that are set forth that you are going through in Exhibit B which is entitled Monetary Authority Law demonstrate that contrary, from your prospective, to the statement in the affidavits submitted that the PMA is not autonomous regulator but rather an agency which is in the language of the injunction that was entered in the District of Rhode Island is properly within the purview of the wherefor clause?

MR. TOLCHIN: That's correct, Your Honor, and both in the injunction and in the restraining order which is the first two pages of that exhibit exactly. They want to say --

dw

24

-Proceedings-

THE COURT: I understand what your argument is. Why don't you continue, please. You don't need to go through the rest of the document.

MR. TOLCHIN: They have come before Your Honor and they say the Bank of New York is holding $30 million and we want an order from you saying that the Bank of New York can release that money and give it back to them and they freely admit they are going to take it and give it away to other people and its going to be gone from the United States shores and we will never see it again, they want Your Honor to do that based on Mr. Bushell's say so that its really an independent organization and has nothing to do with the judgment debtor and I'm showing

Your Honor that by the very statute that they have put before the Court and they are vouching for as being in fact the statute which I don't know but by that statute there is certainly a substantial question about whether they are an independent, insulated corporate body and they very cleverly but I think legally inaccurately used this word autonomous I noticed Your Honor quoted it. An autonomous entity is not necessarily insulated from a judgment, for example, the commercial division is an autonomous entity within the court system but its part of the court system. Its not a separate corporation, its not a separate court. They may very well function sort of in

dw



their own office on their own on a day to day basis but they are not a separate corporation. We don't see any certificates of incorporation, the only document we see shows that the Palestine Authority Chairman can appoint their board members, authorize money going in and money coming out, is liable for their debts, and receives their profits.

So under all under the standard tests of altered ego corporate veil piercing theory they meet -- we in this case meet every single criteria that is ever that are ever discussed as being the criteria or piercing a corporate veil and I'm sure Your Honor that there's plenty more that I can say, for example, it has been determined in other courts in other cases and also in this case in Rhode Island that the Palestinian Authority, Palestine Monetary

Fund are in fact the same being. I don't have these here to show you, I just received these papers today so whatever becomes of this argument this is not what I'm saying now is not the final word, we do need an opportunity to put in papers and I would strongly urge Your Honor not to entertain any order at this time that would have the effect of releasing the money until the issues are decided because if the money is released it will never been seen again.

Your Honor is 100 percent correct that the judge

dw



in Rhode Island who issued the injunction is truly the judge who should be deciding the contours and parameters of the injunction whether he meant it to apply here or not. There is no reason whatsoever why this application couldn't have been made to him. I think perhaps they are looking for another forum and they don't want to go back to the judge to issue a $100 million judgment which was affirmed by the First Circuit.

This case arises out of a terrorist attack in which the Plaintiffs' decedents were machine gunned as they were driving in the car with their family. People are dead. This is a tragic case. They are survivors children or families are trying to get some recovery here. They have gone all the way through the court system. They have a judgment fair, they were litigated -- represented by Ramsey Clark the former Attorney General of the United States. They had their day in court. We are looking to

collect the money and it should not be released just on a three-page affidavit.

I would also like to mention that the idea that there is any urgency here really shouldn't sway the Court in Mr. Abed's affidavit he says that he found out about this injunction on May 18. I believe its 17 days that have gone by, maybe more, in which he took no action. We know he got it because he says in his affidavit May 18 and

dw



he called Rhode Island counsel on May 19 to ask for a copy of the judgment and then he sat around and sat and on Friday afternoon, two days ago, was the first time he saw fit to file something in the court. It strains frailty to think this is a matter of 24 hour urgency when they behaved in that way and I know that holding up this $30 million in some way limits their ability to conduct transactions is nonsense. They admit in their papers they have reserves of $500 million, so if you have $500 million and $30 million is under a restraining notice, that leaves $470 million that you can use for your transactions certainly to carry you through for a couple of weeks until an order to show cause is briefed.

THE COURT: Mr. Bushell, you wanted to respond.

MR. BUSHELL: Just a few target points to focus the Court back on the exact inquiry.

First, we attached the exhibit that Mr. Tolchin cited. Its not like anybody is running from it or hiding from it. The exhibit was set up and the PMA was

established in '95. The reason it was set up was to be the central bank of sovereign state. It never occurred, the Palestine never became a sovereign state so it functions instead as a facilitator, so the reference is to holding reserves and reporting to the PA are not in fact the case and that's what Mr. Abed was in from Ramallah has

dw



prepared his affidavit. Independent of what it says in the document we attached, the fact as set forth in the sworn affidavit by a man who used to be very senior at the IMF before he took a position --

THE COURT: I read his affidavit.

MR. BUSHELL: So that's item one.

Second, there was a reference and I think it was just to clarify the federal court enjoined the Bank of New York. The federal court did not enjoin the Bank of New York, it issued the order that you see which referenced only the PA --

THE COURT: I understood that.

MR. BUSHELL: Third, the reason the PMA did not know about what was going on in Rhode Island, the PMA is not a defendant to anything that was happening in Rhode Island. Its an independent organization.

Fifth, irrespective even if for purposes just of this argument, Your Honor, you conclude the PMA is or there is enough at this very moment for there to be a fair dispute as to whether it is an agent or not of the PA the Palestinian Authority the money that was seized is not

even their money and the money that was frozen is not their money. Its their clearing house as much as the Federal Reserve Bank is, so what ended up happening whether by accident or intent is the list of entities at

dw



the back have had those funds frozen and Mr. Abed and his bank can't clear transactions going forward which is on mistake. Its unlike the Federal Reserve Board in that it doesn't have enough feet to hang in there if a mistake is made, so this mistake, we call it a mistake for purposes of this dialogue, has the effect of doing injury far beyond what even mistake is on funds that are not even the PMA's. So there is a fairly significant urgency. Its obvious its not a monetary relief. The Court has jurisdiction its the wrong funds seized on the wrong party. Even if you said its the right party its still the wrong funds and those are the exhibits that are attached as Exhibit E and Exhibit D lists the actual banks that are cleared through this bank. It does not list the PLO or PA and if you look at the judge's order and if you look at the Notice of Injunction that was issued you see where it went wrong. The judge's order doesn't talk about the PMA but the Notice of Injunction makes that leap and I can understand I can understand how the people in the underlying lawsuit feel and if I were them I would be aggressive as well, but this time, Your Honor, its the wrong entity and the wrong funds and it has a collateral effect of doing greater harm than even those at stake.

So that's our position.

MR. TOLCHIN: Your Honor, may I?

dw

30



THE COURT: Take one minute.

MR. TOLCHIN: The point that Mr. Bushell just raised about the funds belonging to other banks, we don't from his papers we don't actually know who they claim the funds belong to. What they say, for example, is that 24 -- $2.4 million belongs to the Bank of Palestine that was transferred through them but the Bank of Palestine in all likelihood was transferring this on behalf of its deposit which may very well be the Palestinian Authority for all we know. Certainly that's the type of issue if this proceeding is to go forward that we would seek to document in order to present the issues in a robust way with full record. Just very simply if I give money to somebody to hold for me and he puts it in the bank and the bank assets get seized the money is ultimately mine.

THE COURT: Counsel, I think I understand what the issues are. Let's take a brief recess -- did you want to say something.

MR. BUSHELL: One brief.

THE COURT: Take it.

MR. BUSHELL: I know we are taking up a lot of this Court's time.

THE COURT: You are not taking up my time.

MR. BUSHELL: Mr. Abed has travelled from Ramallah. If its okay with Your Honor he would like to

speak. He's articulate he is formerly with the IMF. He is more articulate than I, sorry to say.

THE COURT: I am happy to give him an opportunity to say what he has to say. He is not under oath and I will take a minute or two. He is here, he will say it and then I will take the recess and decide what I'm going to do here.

Mr. Abed, take the podium.

MR. ABED: Thank you, Your Honor.

Briefly, the law was drafted as a result of agreement the role of the PMA between Israel and Palestinians of '95 as was indicated many of the provisions of that law trying to establish future central bank never materialized. For example, the capitalization of the PMA which was supposed to be paid up by the Palestinian Authority was never in fact paid by Mr. Arafat or Palestine Authority. It was generated internally from interest income of the PMA. The fact that we are supposed to be holding gold and reserve we don't have our own currency we don't generate reserves and gold. We don't hold reserves or gold. We don't have our own national currency. We operate in U.S. dollars, Israel shekel, Jordanian dinars and euros. We clear balances every day from all the banks. Every check written on any account in any of these commercial banks, any transfer made from one

client of a bank to another client of another bank runs through a system that we manage. We manage the system by holding funds for all the banks and at the end of each day we debit and credit the accounts of those banks. Our entire balance sheet has nothing in it that belongs either to the PA or the PLO. It consists of strictly an exclusive four items, our own capital and reserve which as I said was generated from internal revenue, a profit non-fund for the employees to which they contribute, required reserves by commercial banks put in limited to us, required reserves are held by any central bank in any country as a way of regulating the banking system. Fourth item is equity that we hold for the banks to manage this transfer and checking system every day. We clear in U.S. dollars, in Israel shekels go through the Bank of Israel where the government of the Bank of Israel and we have agreed the Governor of the Bank of Israel, Stan Fischer, is a former colleague of mine, the Jordan dinars go through Jordan, euros go through the UCB. The dollar balances at the end of the day any country have to end up in some U.S. bank. This is the Bank of New York through whom our own bank deals every day. These checks and transfers in dollars around 20 million, $30 million every day written by Palestine businessmen on Palestinian commercial banks have to go through the Bank of New York

dw

and be cleared. They belong to individuals, to commercial banks or to private contractors who need to be paid. We affect those payments on behalf of the commercial banks because we manage the accounts. We do this because its a function of every central bank to keep the liquidity moving so a poor bank that doesn't have liquid doesn't make the client to wait for weeks and days to collect. We smooth the operation of privately-owned commercial banks. It was this process that was caught in the net on May 18. $30 million were blocked and frozen, since that day we have refrained from effecting any dollar payments through the Bank of New York for fear that these privately owned funds that resulted from private contracts and private checks written would be stopped. The situation is aggravated every day that the freeze exists. The banks that we are debiting and crediting the banks are without getting any money. Its costing, costing us several thousand per day. It is eroding our credibility with our banking system. Its undermining the execution of private contracts and implementation of regulatory function and its putting us in a situation where the situation gets worse and worse every day that this freeze holds. We need to unblock the 30 million out because to send it back to the banks which it belongs and the clients where those held with those banks and we need to reopen the process so

dw



that we can clear our balances every day. These balances

belong to commercial banks. We are a regulatory agency for commercial banks. We are autonomous. The Governor and board are masters of the own fate in everything PMA has to do. It is true the PMA like any central bank of any country is part of the state apparatus but all central banks are designed to be independent autonomous and run their monetary affairs without interference with anyone.

This is exactly the case that we have here, Your Honor. So we need to unblock the unfreeze the 30 million, send it back to its owner, to private money. It doesn't among to PLO, we don't have any money, we never managed a penny from the PLO or PMA from the beginning we dealt with commercial banks and financial institutions. Our balance sheet is clear. Its part of the exhibit, I have a sworn affidavit indicating what these funds are and any sequestering or freezing of those funds is really interfering with the private contract. No matter what those judgment is on the underlying case and I sympathize and am horrified by the results of that case on a human level. Here we are talking about freezing privately owned funds for a case that is totally unrelated.

Your Honor, we very much appreciate you looking into this case to help us go back to do our daily business of with private contracts in a private law commercial

dw

35

-Proceedings-

banking system.

Thank you very much.

MR. TOLCHIN: May I have thirty seconds, Your

Honor?

THE COURT: Yes, sir.

MR. TOLCHIN: If they are short of money --

THE COURT: Use that podium.

MR. TOLCHIN: If Mr. Abed is short of money to meet his commitments he should refer to Article 9 of his own law which provides that in a case of insufficiency the National Authority shall pay the difference. He can go get the money from the PA which is the judgment debtor. He wants to tell you we have this law but we don't follow it, things it was meant for don't happen, didn't happen, don't happen, its here, he is evoking it, rely on it.

THE COURT: We will take a recess.

(Whereupon, a brief recess was taken, after which the following occurred:)

THE COURT: Let me say first of all that this is a case which presumptively would be transferred out of the commercial division and it was designated a commercial case, it came to me in light of the fact that I have spent some time here this morning. I will keep it in the commercial division but I exercise my discretion to do that.

dw

36

-Proceedings-

Having said that I am satisfied that there is no basis for me to issue the requested restraining order here. First of all, in my view, this is a matter that really should have been filed, at least clarification should have been sought in the United States District

Court for the District of Rhode Island. I'm asked in effect to construe a restraining order of that court. I'm also asked in effect to deal with a notice of restraining order of that court. It seems to me that the district judge on application should be able to at least initially determine whether or not the Palestine Monetary Authority should or should not be subject to the judgment and the injunction of that court.

With regard to enforcement in New York State, it strikes me that it is premature for me to determine on the state of this record whether there is or is not a factual basis to seek to proceed to enforce that judgment against the Palestine Monetary Authority as an agent or some other relationship to the PA and the PLO and I make no finding one way or the other with regard to that.

Secondly in terms of urgency, I recognize the need for international banking to proceed with unincumbered or unfettered processes. That suggests to me that the irreparable injury that's claimed here has fallen short of the standard since it was on May 18 that

dw



concededly the Plaintiff became aware of the restraint that had been filed with the Bank of New York and some period of time has passed before any action was taken.

So I intend to do the following: I will set this down for set of papers in response but I think before I even do that it would seem to me the expeditious proceeding is to go back to Rhode Island and I don't know,

Mr. Bushell, if you want to if you intend to do that or if you want me to set down a briefing schedule in this case and. deal with the proceedings simultaneously.

MR. BUSHELL: I think, Your Honor, what we would -- I don't have authority as local counsel to make that determination so I would set down proceedings and briefly schedule and if lead counsel from Washington, DC, after consultation with the client wants to go to Rhode Island I will leave it to them. I will notify the Court immediately if that's the case.

THE COURT: Service has been made of the order, it was accepted here by all parties. So I strike out that paragraph. Answering papers shall be served by hand delivery or express mail and filed its missing from the the Order to Show Cause, not later than 5 p.m., 10 days or a week whatever you want.

MR. TOLCHIN: Can we have a tiny bit extra time because of the Jewish holidays next week.

dw



THE COURT: I will give you 10 days. Today is the 6th. I will make it the 17th, that's next Friday. June 17, '05. Reply papers, Mr. Bushell, if any one week or two weeks?

MR. BUSHELL: One week is fine.

THE COURT: That is June 24. They are also to be filed with this Court. And why don't I schedule oral argument on the following Wednesday.

Mr. Mullen, what do we have scheduled on

June 29?

THE CLERK: 10:30.

THE COURT: I will need at least an hour. Do I have it?

THE CLERK: Make it 12 o'clock.

THE COURT: The application is returnable here on 29 June at 12 noon.

MR. BUSHELL: Will that be oral argument or hearing?

THE COURT: I'm not going to be able to do a hearing until I read the papers and hear it with what I need to hear. I will set it down for oral argument. It may be that the affidavits that are submitted will be sufficient and I don't have to turn to an evidentiary proceeding. If I have to I will schedule that. I like to say now the following, I want this case electronically

dw



filed, please, and I want hard copies of everything that's filed here. If you choose or if your client chooses to accept what I think is the appropriate solution here at least initially and return to the District of Rhode Island I would like notice of that if that's occurred and I would like notice of what has happened if anything happens in the District of Rhode Island.

Secondly or thirdly if before this case is back here I would like a copy of this transcript. You can make arrangements with the reporter. So I will be able to read it, it will help me, I'm sure, with whatever proceedings

there are continuing here.

I haven't said anything with regard to discovery but I am satisfied to do one of two things, I'm satisfied to wait until June 29 and if its necessary schedule discovery at that time or if you think its necessary to do it now I will order discovery to begin immediately. I will give you an opportunity to talk to your adversary and among yourselves.

MR. BUSHELL: Why don't we confer. If we can't reach agreement we will write a letter to Your Honor.

THE COURT: That's fine. I will tell you what you will do, if you can't agree you will send me a letter that you can't agree and I want to know that within three days, that's by the close of business Thursday and then

dw



what I will do if its necessary either bring you back before the return date or do it by conference call if it becomes necessary.

Is there anything I missed here today besides the fact I didn't grant your relief, Mr. Bushell?

MR. BUSHELL: One possible way to solve the immediate crisis, Your Honor, is we would like to consider, if its okay with the Court, the ability to post a bond that allows the transactions to occur because this is serious, we didn't bring this just because and if we can post bond on the 30 million that allows the 30 million to be released and them to continue to clear.

THE COURT: I don't intend to take any action

unless its consented to by both sides of that nature until one of two things happen, one a district judge in Rhode Island decides that this is an improper restraining order within the scope of that judgment or I hold a full blown either argument and or hearing here. I think it would be uncensorious of me to in effect grant the TRO which is what you are asking for by the mere posting of the bond. So that's the ruling in response to your request.

Mr. Marks, anything else?

MR. MARKS: I request that the Bank of New York's time to respond to the complaint be extended to after the return date.

dw

41

-Proceedings-

THE COURT: What is the need?

MR. MARKS: To answer the underlying complaint in this proceeding.

THE COURT: I understand.

MR. MARKS: We will submit papers.

MR. BUSHELL: I need to defer with my national counsel.

THE COURT: If you can reach a stipulation for the extension of time do so, otherwise you will file response within the statutory period.

MR. MARKS: Thank you, Your Honor.

THE COURT: Mr. Tolchin, anything else?

MR. TOLCHIN: Nothing further, Your Honor.

THE COURT: Counsel, have a good day.

MR. TOLCHIN: You too.

Did you write up some form of short form order?

THE COURT: I did nothing.

MR. TOLCHIN: There is nothing to copy.

THE COURT: You can order a transcript. The order is essentially my refusal to sign the TRO and briefing schedule.

MR. TOLCHIN: Thank you.

* * *

CERTIFIED THAT THE FOREGOING IS A TRUE AND ACCURATE TRANSCRIPT OF THE STENOGRAPHIC MINUTES IN THESE

dw



PROCEEDINGS.

________________________________

DENISE WILLIAMS, RPR

Official Court Reporter

dw