UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND

-----------------------------------------------------------X

PALESTINE MONETARY AUTHORITY,

Plaintiff,

CA No. 05-261L

v.

DAVID STRACHMAN, as Administrator of the ESTATES OF YARON UNGAR AND ERFAT UNGAR, and THE BANK OF NEW YORK COMPANY, INC.,

Defendants.

**AFFIDAVIT OF GEORGE T. ABED**

-----------------------------------------------------------X

District of Columbia )<br>
): SS<br>
Washington )

GEORGE T. ABED, being duly sworn, deposes and says:

1. My name is George T. Abed. My business address is P.O. Box 452, Ramallah, Palestine. I am over the age of twenty-one years, have personal knowledge as to the matters contained herein and am otherwise competent to testify as to those matters.

2. I hold the position of Governor of the Palestine Monetary Authority (the "PMA"). I was appointed Governor on April 2, 2005. Prior to my appointment at the PMA, I had a long career with the International Monetary Fund ("IMF"). I first joined the IMF staff in 1975 and rose to the position of Deputy Director of the Fiscal Affairs Department and later to that of Director of the IMF's Middle East and Central Asia Department. During 2004, I served as the Special Advisor to the Managing Director of the IMF. I hold a Ph.D in Economics from the University of California, Berkley and a B.Sc. in Engineering Science from the Oregon State University, Corvallis.

3. This Affidavit is submitted in support of the PMA's application for emergency relief from the Bank of New York's recent actions freezing approximately $30 million of funds in PMA's custody. As a result of this action and to protect the funds in its custody, the PMA has since refrained from effecting any further U.S. dollar denominated transactions. This necessary and protective measure has had the impact of impeding the execution of private contracts and hindering commerce more generally in the Palestinian territories.

4. If not remedied as a matter of urgency, the Bank of New York's actions, by blocking private commerce and banking transactions, could cause a banking crisis in the Palestinian territories, with possible fallout elsewhere in the region. Thus far, the PMA has managed to contain details of this crisis to guard against possible adverse public response. However, each day that this situation continues without due process of law, the normal banking

business is interrupted and the PMA is prevented from fulfilling its public responsibility in safeguarding the integrity of the banking system.

5. The PMA is the regulatory authority for commercial banks and related deposit taking institutions in the Palestinian territories. As in the case of most modern central banks, the PMA possesses an autonomous corporate character financially independent from the Palestine Authority and Palestine Liberation Organization. See Article 2 of the Monetary Authority Law, a true and correct copy of which is attached hereto as **Exhibit A**. It neither holds nor manages any funds of the PA or of the PLO or of any other defendant in the above-referenced case.

6. The PMA was created in 1995 as a result of the "Declaration of Principles on Interim Self-Government Arrangements," dated September 13, 1993—also known as the Oslo Accords. The PMA was established with a view to becoming the central bank of the future State of Palestine. As Palestine is yet to achieve sovereignty, the PMA remains an autonomous chartered regulator whose purpose is to facilitate normal banking activity and to help maintain financial stability. Also, because sovereignty has not yet been attained, the PMA does not hold any gold reserves and it does not act as the fiscal agent for the PA. The highest source of authority for the activities of the PMA is its own board of directors, chaired by the Governor. See Article 17 of the Monetary Authority Law, attached as Exhibit A.

7. In addition and notwithstanding Article 8 of the Monetary Authority Law (stating that the PMA's authorized capital of $15 million was to be provided by the PA), the PMA did not receive any subscription capital from the PA or PLO upon its establishment or at any other time since. See Article 8, Exhibit A. Instead, through its own income-related activities, the PMA provided its own operating capital. The PMA has received extensive assistance and support from the U.S. and U.K. governments The PMA continues to receive advice and technical

assistance from both the U.S. and U.K. governments and from the IMF and the World Bank, including assistance in combating the financing of terrorism and the implementation of anti-money laundering safeguards.

8. The PMA essentially acts as a clearing house, or intermediary, for all commercial banks in the Palestinian territories, such as the Arab Bank, PLC, Cairo Amman Bank and the Palestine Bank, Ltd. It transacts in Israeli shekels, euros, Jordanian dinars and importantly for the purposes of the requested emergency relief—in U.S. dollars.

9. The PMA, through its own bank—the Palestine International Bank ("PIB")—clears all U.S. dollar transactions with the PIB's correspondent, the Bank of New York in Manhattan. These transactions arise from daily check clearances, inter-bank transfers and other transfers between private parties and mediated by the PMA. Through this activity, the PMA provides needed liquidity and facilitates transfers among private banks and individuals.

10. On or about May 18, 2005, the PMA discovered that millions of dollars of transactions (of the types noted above) had been inexplicably frozen by the Bank of New York. Additionally, the PMA's ability to move its dollar holdings for interest bearing purposes has been blocked—seriously damaging the PMA's ability to manage the funds in its custody.

11. I immediately investigated the matter, contacting high ranking executives at the Bank of New York. It was explained to me that Bank of New York had received a restraining order entered by the United States District of District of Rhode Island in the case styled, Estates of Yaron Ungar, et al. v. Palestinian Authority, et al., C.A. No. 00-105L (Honorable Ronald R. Lagueux) (the "Rhode Island Action"). A true and correct copy of which is attached hereto as **Exhibit B**.

12. The PMA is neither a defendant in the Rhode Island Action, nor does it hold or manage any assets of the PLO or PA or any assets of any other defendant named in the Action (nor does it have access to any of these funds).

13. To evidence the PMA's autonomy and financial independence from the PA and PLO [and to demonstrate that the blocking or freezing of PMA's transactions with the Bank of New York is without any legal or factual justification], I instructed our auditors to prepare a report detailing the source of the PMA's funds. A true and correct copy of the audit report by Saba & Co. (an international auditing firm), dated May 25, 2005, is attached hereto as **Exhibit C.**[1] This Exhibit clearly shows that all funds in PMA's possession, entirely and exclusively, consist of funds held on behalf of commercial banks, its own capital and reserves and employees' provident funds.

14. In addition, a copy of an electronically generated call report (dated December 31, 2004)—showing the funds each commercial customer believes are held by the PMA (entitled "Required Reserves, Time and Current Cell Deposits with the PMA and differences between PMA Audit statement and the Banks Call Report")—is attached hereto as **Exhibit D**. This report can be reconciled with the auditor's report on the PMA's accounts (Exh. C) within approximately $3 million.[2] Again, this report is evidence that the PMA deals exclusively with privately owned commercial banks and has no financial relationship with the PA or PLO or any other defendant in the Rhode Island Action and that all funds deposited in the PMA are private funds.

15. On May 19, 2005, I instructed our own bank, the PIB, to write to the Bank of New York urging that the Bank honor all outgoing and incoming payments and emphasizing that

---

[1] The report was prepared in accordance with internationally accepted auditing principles and standards.

[2] Discrepancies can be explained due to differences in booking dates and value dates of different entries.

none of frozen funds are assets of the PA or PLO and that the funds belong to the PMA and to the commercial banks it regulates. A true and correct copy of the letter from Mr. Usama Khader, General Manager of PIB to Mr. Ammar Khaleel, Middle East, Eastern Europe & Africa Division for the Bank of New York, is attached hereto as **Exhibit E**.

16. Despite PIB's demands that the Bank of New York unfreeze the transactions in question, the funds remain frozen.

17. Based on the records available to us, we estimate that approximately $30 million in funds remain blocked today. Finally, since we discovered this situation, the PMA has refrained from effecting any U.S. dollar transactions. Every day the freeze continues it results in increasing the financial damages to the PMA, prolonging the period of uncertainty and aggravating the irreparable harm to the banking system in the Palestinian territories.

FURTHER AFFIANT SAYETH NOT.

[signature]

GEORGE T. ABED

Sworn to before me this 9th
Day of June, 2005.

[signature]

Notary Public
Commission Expires
April 14, 2009

**CERTIFICATE OF SERVICE**

I hereby certify that on this 14th day of June, 2005, I caused a true and complete copy of the foregoing Motion for Temporary Restraining Order and Application for Preliminary Injunctive Relief, accompanying Memorandum of Law, supporting Affidavit of George T. Abed and exhibits, Complaint and proposed order to be served

by overnight mail to :

Robert Tolchin, Esq.
JAROSLAWICZ & JAROS
150 William Street
New York, New York

and by hand-delivery to :

David Strachman, Esq.
MCINTYRE, TATE, LYNCH & HOLT
321 South Main Street,
Providence, RI 02903

Administrator for the Estates of
Yaron and Erfat Ungar and counsel for
Dvir Ungar, (Minor, By His Guardians And
Next Friend, Professor Meyer Ungar),
Judith Ungar, Rabbi Uri Dasberg and Judith Dasberg
(Individually and in Their Capacity as Legal
Guardians of Plaintiffs Dvir Ungar and Yishai Ungar),
Amichai Ungar, Dafna Ungar, and Michal Cohen.

Charlene Perry